IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
SHUFFLE TECH INTERNATIONAL    )
LLC., an Illinois limited     )
liability company,            )
                              )
            Plaintiff,        )
                              )
    v.                        )  No. 11 C 7358
                              )
WOLFF GAMING, INC., a         )
Colorado corporation,         )
                              )
            Defendant.        )
                              )
_____ )
                              )
                              )
WOLFF GAMING, INC., a         )
Colorado corporation,         )
                              )
            Counter-Plaintiff,)
                              )
    v.                        )
                              )
SHUFFLE TECH INTERNATIONAL    )
LLC., an Illinois limited     )
liability company, and        )
RICHARD J. SCHULTZ, an        )
Illinois resident,            )
                              )
            Counter-Defendants.
```

**<u>MEMORANDUM OPINION AND ORDER</u>**

In March of 2010, Richard Schultz began negotiating on behalf of his company, plaintiff Shuffle Tech, towards a development and distribution agreement with defendant Wolff

1

Gaming.[1]  Shuffle Tech, an Illinois limited liability company, manufactures and sells consumer-grade automatic card shuffling machines, and Wolff Gaming, a Colorado corporation, manufactures and sells gaming equipment to casinos and other establishments. The parties envisaged an agreement under which Shuffle Tech, with financial support from Wolff Gaming, would develop casino-grade card shufflers, of which Wolff Gaming would then be the exclusive distributor in the Americas.

Two documents, both drafted on June 3, 2010, memorialize the parties' negotiations.  The first is a letter of intent, which expresses the parties' "mutual commitment to proceed with the draft Development and Distribution Agreement" (the "Letter of Intent"), and the second is the Draft Development and Distribution Agreement referenced in that letter (the "Draft Agreement").  Although the parties began working toward the objectives set forth in these documents, their relationship soured before the development of a casino-grade shuffler was complete, and on August 1, 2011, Schultz wrote to Wolff suggesting the parties "settle all outstanding business…and go [their] separate ways."  Just over a year later, Shuffle Tech licensed its shuffler technology to another company.

---

[1] For ease of reference, I refer to Schultz and Shuffle Tech collectively as "plaintiffs," though I recognize that technically, only Shuffle Tech is the plaintiff, while Schultz is a counter-defendant.

2

In the meantime, plaintiffs brought this action in October of 2011, seeking a declaration that the Draft Agreement is not an enforceable contract, and that plaintiffs owe no duties to defendant pursuant to that agreement. Plaintiff also asserted a claim for breach of contract based on the Letter of Intent. Defendant has counter-sued plaintiffs for a declaration that the Draft Agreement is, in fact, an enforceable agreement and further asserts claims for breach of contract, fraud, breach of fiduciary duty, and unjust enrichment.

Now before me is plaintiffs' motion for summary judgment, which seeks judgment in its favor on its own declaratory claim and on all of defendants' counterclaims.[2] For the reasons that follow, I grant plaintiffs' motion.

I.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating an absence of genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

---

[2] Neither plaintiffs' motion nor the accompanying memorandum makes any reference to plaintiffs' claim for breach of the Letter of Intent. Accordingly, this decision does not resolve that claim.

3

317, 323 (1986). When a summary judgment motion is supported by evidence as provided in Rule 56(c), however, the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Under Illinois law, which the parties agree governs the issues here, "the intent of the parties controls the question whether a contract exists. Of course when we speak of 'intent,' we are referring to a party's outward expression as manifesting his intention rather than to some secret and unexpressed intention." *Conn. Gen. Life Ins. Co. v. Chicago Title and Trust Co.*, 714 F.2d 48, 50 (7th Cir. 1983) (citations omitted). "In measuring intent, the court must consider all relevant circumstances surrounding negotiation and execution of the document, as well as the language of the document itself." *Id.* As the party seeking to enforce the Draft Agreement, defendant bears the burden of establishing the existence of the agreement. *World Championship Wrestling, Inc. v. GJS Int'l., Inc.,* 13 F. Supp. 2d 725, 734 (N.D. Ill. 1998). Plaintiffs first argue that enforcement of the Draft Agreement is barred by Illinois' statute of frauds, 740 ILCS 80/1, which requires contracts that cannot be performed within one year to be in writing and signed by the party to be charged. The Draft Agreement, plaintiffs assert, does not meet this requirement because it contemplates "an initial term of two (2) years from date

4

of execution," and was not signed on the signature page. Exh. A to Pl.'s L.R. 56.1 Stmt., Exh. 1 [DN 71-3 at 23, 30]. Plaintiffs further argue that even assuming the Draft Agreement satisfied the statute of frauds, it is plain from the face of the document, as well as from the contemporaneous Letter of Intent and the parties' subsequent communications, that the parties did not intend the Draft Agreement to be a binding contract.

As evidence of the parties' intent, plaintiffs point first to the heading at the top of the first page of the Draft Agreement, which reads, "Discussion <u>Draft Only</u>, Revised 6/3/10." (Original emphasis) *Id.* at 21. Next to this heading, Wolff affixed his signature and Schultz his initials. Meanwhile, neither party executed the signature page at the end of the Draft Agreement. *Id.* at 30. Plaintiffs argue that Wolff's and Schultz's markings next to the "<u>Draft Only</u>" header, together with their failure to execute the signature page, can only reasonably be read to reflect their mutual understanding that the Draft Agreement was neither final nor binding.

Plaintiffs next point to the Letter of Intent as evidence that the parties did not intend to be bound by the Draft Agreement. The Letter of Intent states that the parties' "mutual commitment to proceed is contingent upon attorney review and gaming authority review," and that "language of the [D]raft Agreement is subject to modification to conform to applicable gaming law and regulation."

5

In addition, the Letter of Agreement sets forth the terms of defendant's agreement to pay plaintiffs "earnest money" in the amount of $100,000.

Earnest money, plaintiffs argue, is a "deposit," which is ordinarily paid before a final agreement is consummated for the purpose of showing "a good-faith intention to complete the transaction." *Super Stop Petroleum, Inc. v. Clark Retail Enterprises, Inc.*, 308 B.R. 869, 891 (Bankr. N.D. Ill. 2004). This is indeed how the term was used in the Letter of Intent, plaintiffs submit, as evidenced by the provision granting defendant the right to request a refund of the earnest money "in the event that a final Agreement cannot be signed within 90 days." Exh. A to Pl.'s Rule 56.1 Stmt., Exh. 5 [DN 71-3 at 36].

Plaintiffs argue that the language relating to attorney and gaming authority review further evidences the parties' mutual understanding that additional conditions would have to be met before the Draft Agreement became enforceable. Plaintiffs further assert that the "earnest money" provisions in the Letter of Intent, which explicitly contemplate the possibility that the parties will not reach a final distribution agreement, reinforce the conclusion that the parties did not intend the contemporaneously drafted Draft Agreement to represent an enforceable agreement.

Finally, plaintiffs contend that the parties' communications in the period following the creation of the Draft Agreement support

6

the conclusion that the Draft Agreement did not represent the parties' ultimate meeting of the minds. Plaintiffs cite, among other evidence, emails Schultz and Wolff exchanged in late June of 2010, which they argue reflect the parties' mutual understanding that the distribution agreement had yet to be finalized. Defendant does not dispute that on June 28, 2010, Schultz sent Wolff an email regarding the status of their agreement, saying he "[j]ust wanted to check in on the contract," and specifically asking Wolff "where you're (sic) contract and gaming attorneys are on that." Pl.'s L.R. 56.1 Stmt., Exh. C (Schultz Aff.), Exh. 1 [DN 71-6 at 8]. Schultz explained that he was "waiting for them and any comments so we can get that locked down." *Id*. The next day, Wolff responded, "I will follow back up as quickly as I can." *Id*. On July 12, 2010, Schultz again prompted Wolff by email to proceed with attorney review, stating, "[j]ust wanted to follow up on this so we can get it locked down. Any word from your lawyer(s)?" *Id.* at 9. Then, in mid-August of 2010, Schultz sent Wolff another email expressing his concern that the parties did not have "the entire deal formalized," explaining, "[w]e need to know that everything is in place." *Id.* at 10. These missives, plaintiffs submit, reinforce what is explicit on the face of both the Draft Agreement and the Letter of Intent: that the Draft Agreement does not represent the parties' final meeting of the minds, and that they did not intend to be bound by its terms.

7

I need not resolve the disputed statute of frauds issue because I am amply persuaded that the foregoing evidence allows for but one reasonable conclusion: the parties did not intend be bound by the Draft Agreement. Accordingly, I conclude that the Draft Agreement is not an enforceable contract, even assuming it satisfies the Illinois statute of frauds.

Defendant tacitly concedes, as it must, that the enforceability of the Draft Agreement hinges on whether the parties intended to be bound by it. *See* Def.'s Opp. at 8. Yet defendant cites no evidence that meaningfully controverts the evidence discussed above, all of which indicates that both sides anticipated additional review and possible modification of the Draft Agreement before it would become final. Defendant gamely argues that Schultz's and Wolff's markings next to the header on the first page of the Draft Agreement effected execution of the Draft Agreement. I agree with plaintiffs, however, that this is not a reasonable interpretation of the evidence.

As the Seventh Circuit has noted, "parties who make their pact 'subject to' a later definite agreement have manifested an (objective) intent not to be bound." *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989). This is precisely what the parties did here. The Letter of Intent stated not only that the Draft Agreement was "subject to modification to conform to applicable gaming law and regulation," but also that their "mutual

8

commitment to proceed with" the Draft Agreement was "contingent upon attorney review and gaming authority review," which, for all that the record reveals, the parties neither sought nor obtained. That the parties reached a preliminary agreement to proceed with negotiations did not transform the Draft Agreement into a binding contract. *See Empro*, 870 F.2d at 426 ("Illinois…allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics… So long as Illinois preserves the availability of this device, a federal court in a diversity case must send the disappointed party home empty-handed.").

Nor does defendant's argument that the parties "adopted" the Draft Agreement through substantial performance raise a triable issue as to whether the Draft Agreement is an enforceable contract. Defendant argues that it substantially performed its obligations under the Draft Agreement by making payments to Shuffle Tech. But the bulk of the payments defendant claims to have made ("between $120,000 and $125,000" -- though I am unable to ascertain from defendant's citation to "W, p. 93" whether these payments are, in fact, supported by the record) are consistent with the terms of the Letter of Intent, and the remainder does not correspond to any payments contemplated in the Draft Agreement. See Exh. A to Pl.'s L.R. 56.1 Stmt., Exh. 4 [DN 71-3 at 24]. Nor does evidence that the parties took steps to further the ultimate objectives of their

9

anticipated agreement (as Schultz did when he directed potential customers to defendant, representing to them that defendant was Shuffle Tech's "exclusive distributor"), transform the Draft Agreement into an enforceable contract. *See World Championship Wrestling*, 13 F. Supp. 2d at 732. Indeed, "where the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery," regardless of whether the parties represented to others that they had a "deal." *Chicago Title & Trust Co. v. Ceco Corp.,* 415 N.E.2d 668, 677 (Ill. App. Ct. 1980). In view of the parties' clear intent to take further steps before finalizing their agreement, Schultz's representations to potential customers that defendant was Shuffle Tech's exclusive distributor is insufficient to persuade a reasonable jury that the Draft Agreement is enforceable as the parties' ultimate "meeting of the minds." *See id*. To the extent defendant raises additional arguments for enforcing the Draft Agreement, they are without merit and do not require further examination.

I now turn briefly to defendant's counterclaims for fraud, breach of fiduciary duty, and unjust enrichment, which likewise warrant little discussion. In its fraud claim, defendant asserts that plaintiffs made intentional misrepresentations to Wolff regarding defendant's exclusive distribution rights. Defendant

cites emails Schultz sent to prospective customers in which Schultz represented, for example, that Shuffle Tech's product was "being distributed exclusively through Wolff and/or Wolff distributors," and argues that these statements were false in view of plaintiffs' belief at the time Schultz made the statements that the parties' distribution agreement had not yet been finalized. Defendant asserts that Schultz either copied Wolff on such emails or otherwise informed him of their content, including the alleged misrepresentations, to induce defendant to "try to drum up sales."

To prevail on this counterclaim, defendant must prove: 1) that plaintiffs made a false statement of material fact; 2) plaintiffs' knowledge that the statement was false; 3) plaintiffs' intent that the statement induce the defendant to act; 4) defendant's reliance upon the truth of the statement; and 5) defendant's damages resulting from reliance on the statement. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881-82 (7th Cir. 2005) (citation omitted). To satisfy the fourth element, defendant must establish that any reliance on allegedly false statements was justifiable. *Id.*, citing *Soules v. Gen. Motors Corp.*, 402 N.E. 2d 599, 601 (Ill. 1980). Defendant's claim fails on at least this element.

As the Seventh Circuit noted in *Davis*, "Illinois courts have long recognized that 'a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded

11

the opportunity of knowing the truth ... he cannot be heard to say he was deceived by misrepresentations.'" 396 F.3d at 882 (citing cases). As discussed above, the evidence in this case conclusively shows that the parties did not execute a final distribution agreement. Moreover, there is no dispute that Schultz believed the deal was "not entirely formalized," and periodically reminded Wolff that outstanding issues needed to be addressed. Indeed, Wolff agreed to "follow back up" on these issues but failed to do so. Because defendant knew that the parties' agreement had not been finalized, and knew Schultz believed further steps were required before it would become so, no reasonable jury could conclude that defendant justifiably relied on the statements on which it bases its fraud claim.

Plaintiffs are entitled to summary judgment of defendant's counterclaim for breach of fiduciary duty for the simple reason that plaintiffs owed defendant no such duty. "[P]arties to a contract are not each other's fiduciaries." *Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) (citing cases). In tacit acknowledgement of this principle, defendant premises its claim on the parties' purported cooperation in a joint venture. But this characterization of the parties' relationship lacks any evidence in the record. Indeed, defendant's only support for its claim that the parties were engaged in a joint venture is the text of the

Letter of Intent and the Draft Agreement. Defendant purports to find the basis for a fiduciary relationship in language stating, for example, that "the parties intend to cooperate," and that they "confirm their mutual commitment to proceed" with an agreement. But these unremarkable contractual terms fall far short of the kind of evidence required to establish the existence of a fiduciary relationship, which "must be shown by proof so clear and convincing, so strong, unequivocal and unmistaken that it leads to only one conclusion." *Carey Elec. Contracting, Inc. v. First Nat. Bank of Elgin*, 392 N.E. 2d 759, 763 (Ill. App. Ct. 1979).

Finally, plaintiffs are entitled to summary judgment on defendant's counterclaim for unjust enrichment. To prevail on a claim for unjust enrichment, defendant must prove that plaintiffs are "retaining a benefit to the [defendant's] detriment, and this retention is unjust." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518 (7th Cir. 2011). The benefits defendant claims plaintiffs have unjustly retained are: 1) payments defendant made to fund the development of a casino-grade shuffler; 2) uncompensated time Wolff devoted to the project; and 3) unidentified "suggestions" Wolff made to the shuffler's design. But the evidence is not such as could persuade a jury to find in its favor on this claim. To begin, the evidence is uncontroverted that shortly after suggesting the parties "go [their] separate ways, plaintiffs contacted the defendant on several occasions regarding the return of the earnest

13

money, and that defendant has failed to respond. As for the remaining "benefits" defendant claims to have conferred, defendant cites no authority, and articulates no reasoned analysis, to explain why plaintiffs' retention of these purported benefits "violates the fundamental principles of justice, equity, and good conscience." *Id.* (quoting *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). On their face, these "benefits" appear to be nothing more than the investments parties routinely incur in the course of working towards a deal they expect to be mutually beneficial.

## II.

For the foregoing reasons, plaintiffs' motion for summary judgment is granted.

**ENTER ORDER:**

_____
Elaine E. Bucklo
United States District Judge

Dated: June 11, 2013